# IN THE SUPREME COURT OF IOWA

No. 08–1048

Filed December 3, 2010

**STATE OF IOWA,**

Appellee,

vs.

**JASON ALLEN WING,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, J. Hobart Darbyshire, Judge.

Defendant was granted further review of court of appeals' decision affirming district court's denial of his motion to dismiss. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kyle Hanson, Assistant Attorney General, Michael J. Walton, County Attorney, and Robert Weinberg, Assistant County Attorney, for appellee.

**HECHT, Justice.**

In this case we are asked to determine whether the defendant's encounter with law enforcement amounted to an arrest for purposes of the speedy indictment rule. We conclude it did.

**I. Background Facts and Proceedings.**

On July 7, 2007, Detective Lansing of the Davenport Police Department received a tip that Jason Wing was going to transport a large quantity of marijuana across the city. As a result, Lansing and other members of the Tactical Operations Bureau set up surveillance of Wing's house. After a short time, they observed Wing exit the house, place a package in the trunk of a red Pontiac, and get into the passenger side of the vehicle. Brandi Basden entered the vehicle on the driver's side and drove away. Lansing contacted Officer Schertz, who was driving a marked patrol car, explained the situation, and asked him to execute a traffic stop of the vehicle driven by Basden. Schertz located the vehicle, determined the registration was expired, and pulled it over.

Officer Schertz approached the car and told Basden that her registration was expired. Schertz also asked Wing for identification, which Wing readily produced. When Basden stepped out of the car to sign the citation, Schertz asked if he could search the car, and she agreed. Officer Schertz instructed Wing to get out of the car, patted down both Wing and Basden, and directed them to stand on the sidewalk "or do whatever."[1] After searching the interior of the car, Schertz searched the trunk and located a box containing a brick of marijuana.[2]

---

[1] The events of July 7, 2007, are gleaned both from the testimony of the officers and Wing himself, as well as from State's Exhibit 1, a video recording of the traffic stop captured by a camera located on Schertz's patrol car.

[2] Officer Schertz had apparently not only been informed that the other officers suspected the vehicle contained marijuana, but that they believed it was in the trunk because as he searched the interior of the car, he radioed to the other officers,

Officer Schertz left the box in the trunk, but asked Basden to sit in the back of the patrol car. Wing asked Schertz if he had found the drugs, and Schertz said, "Yeah, I found the pot in the trunk of [the] car." Wing admitted ownership of the marijuana. Immediately, Officer Schertz said, "What's that? It's yours? Okay, Jason, at this time, you have the right to remain silent." Schertz informed Wing of his rights, handcuffed him, conducted another more thorough pat down search, and placed him in the backseat of the patrol car.[3] Basden, who had not been Mirandized or handcuffed, was allowed to get out of the patrol car.

Detective Proehl, who had been working on the Tactical Operations Bureau with Detective Lansing and had observed the traffic stop from a short distance away, arrived at the scene of the traffic stop moments after Wing was placed in the patrol car. Proehl asked if Wing had been Mirandized, and Schertz explained what had taken place: "He asked me if I found that pot, and I said 'yeah,' and he said 'it's mine, don't charge her with it, it's mine.' So I Mirandized him right then and there, and put him in the back of the car."

Detective Proehl got into the patrol car with Wing and asked Wing about the marijuana. Wing again admitted ownership of the contraband. Proehl asked for, and Wing granted, permission to search Wing's house. Proehl then asked Schertz to drive Wing to Wing's house. Using police codes, Schertz asked Proehl if Wing was being arrested. Proehl responded that Wing was a "10-59," meaning the officers were "giving

_____

indicating that he had consent to search the car and that he was searching the passenger compartment, "trying to make it not look that obvious."

[3]Officer Schertz testified he placed handcuffs on Wing for safety reasons, because he was the only officer on the scene and because he was concerned that Wing might try to flee.

[him] a ride somewhere." The officers removed Wing's handcuffs before they transported him to his house and undertook the search.[4]

When they arrived at Wing's house, Schertz left while Proehl and Wing entered the house. Wing signed a form consenting to the search. During the search, in which additional incriminating evidence was found, Proehl inquired whether Wing would be interested in cooperating with law enforcement in other drug investigations. Wing indicated he was interested. At the conclusion of the search, Proehl gave Wing an inventory of the seized items and a business card. Proehl told Wing to call him.

Wing apparently did not call Proehl. After about five months, a criminal complaint was filed against Wing on December 18, 2007, and a trial information was filed on January 11, 2008.

Wing filed a motion to dismiss for failure to comply with Iowa Rule of Criminal Procedure 2.33(2)(*a*) which requires an indictment be filed within forty-five days of an arrest, arguing he had been arrested on July 7, 2007. After a hearing on the motion, the district court concluded Wing had not been arrested during his encounter with law enforcement in July and rule 2.33 had not been violated. Wing agreed to a trial on the minutes of testimony and was convicted of possession of a controlled substance with intent to deliver. Wing appealed, contending his right to

---

[4]Wing testified the handcuffs were not removed until after he was taken to his house and agreed to cooperate with the officers. However, Officer Schertz testified Detective Proehl removed the handcuffs at the scene of the traffic stop, and Detective Proehl's testimony indicates the handcuffs were removed at the scene of the stop after Wing agreed to permit a search of his house. The video recording indicates that after the officers discussed Wing's "10-59" status, Officer Schertz asked Detective Proehl if he should remove the handcuffs. Proehl's response is not recorded. However, the district court found the handcuffs were removed at the scene of the stop, and because this finding is supported by substantial evidence, it is binding on appeal. *State v. Lyrek*, 385 N.W.2d 248, 250 (Iowa 1986).

a speedy indictment was violated. We transferred the case to the court of appeals, which affirmed the district court's ruling and the resulting conviction. We granted Wing's application for further review.

## II. Scope of Review.

We review a district court's decision regarding a motion to dismiss for lack of speedy indictment for correction of errors at law. *State v. Dennison,* 571 N.W.2d 492, 494 (Iowa 1997). We are bound by the findings of fact of the district court if they are supported by substantial evidence. *State v. Lyrek,* 385 N.W.2d 248, 250 (Iowa 1986).

## III. Discussion.

Wing contends that for purposes of the speedy indictment rule, he was arrested during his encounter with police on July 7, 2007, and a timely indictment should have been filed on or before August 22, 2007.[5] Instead, the complaint was filed in December 2007, and the trial information was not filed until January 11, 2008, roughly six months after Wing's encounter with law enforcement.

The parties do not dispute the applicable law or its interpretation. Rather they disagree about how the specific facts of Wing's case fit into the framework established by our court rules, the Iowa Code, and our case law applying these provisions.

> Our analysis must begin with the speedy indictment rule itself.
>
> It is the public policy of the state of Iowa that criminal prosecutions be concluded at the earliest possible time consistent with a fair trial to both parties. . . .
>
> > *a.* When an adult is arrested for the commission of a public offense . . . and an indictment is not found against the defendant within 45 days, the court must order the prosecution to be dismissed, unless good cause to the

---

[5]For purposes of rule 2.33(2)(*a*) an indictment includes a trial information. *State v. Lies,* 566 N.W.2d 507, 508 (Iowa 1997).

contrary is shown or the defendant waives the defendant's right thereto.

Iowa R. Crim. P. 2.33(2)(*a*). The speedy indictment rule, and its counterpart, the speedy trial rule articulated in rule 2.33(2)(*b*), implement federal and state constitutional speedy trial guarantees. *State v. Cennon,* 201 N.W.2d 715, 718 (Iowa 1972); *State v. Deases,* 476 N.W.2d 91, 95 (Iowa Ct. App. 1991). The purpose of both the criminal procedural rules and the constitutional provisions is to "relieve an accused of the anxiety associated with a suspended prosecution and provide reasonably prompt administration of justice." *State v. Delockroy,* 559 N.W.2d 43, 46 (Iowa Ct. App. 1996); *see also State v. Allnutt,* 261 Iowa 897, 901, 156 N.W.2d 266, 268 (1968), *overruled on other grounds by State v. Gorham,* 206 N.W.2d 908, 913 (Iowa 1973). The speedy indictment and speedy trial rules also aim to prevent the harm that arises from the "possible impairment of the accused's defense due to diminished memories and loss of exculpatory evidence." *State v. Olson,* 528 N.W.2d 651, 654 (Iowa Ct. App. 1995). This type of harm is the "most serious," because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker v. Wingo,* 407 U.S. 514, 532, 92 S. Ct. 2182, 2193, 33 L. Ed. 2d 101, 118 (1972).

Before 1978, the time for speedy indictment began to run when "a person [was] *held to answer* for a public offense." Iowa Code § 795.1 (1975) (emphasis added). In 1976, the General Assembly rewrote the Iowa Criminal Code, and section 795.1 became Iowa Rule of Criminal Procedure 27 (now rule 2.33), providing that the speedy indictment clock begins running when a person is "*arrested* for the commission of a public offense." 1976 Iowa Acts ch. 1245(2), § 1301 (codified at Iowa Code ch. 813, r. 27 (1979)) (emphasis added). The new Iowa Criminal Code also

reworked provisions defining arrest. *Id.* §§ 401–429 (codified at Iowa Code ch. 804 (Supp. 1977)).

> It is a well-settled rule of statutory construction that statutes relating to the same subject matter shall be construed together, particularly if the statutes were passed in the same legislative session. Therefore, we define "arrest" in [rule 2.33] to be the same as the definition provided in section 804.5, as explained in section 804.14.

*State v. Schmitt*, 290 N.W.2d 24, 26 (Iowa 1980) (citations omitted).[6]

An arrest "is the taking of a person into custody when and in the manner authorized by law, including restraint of the person or the person's submission to custody." Iowa Code § 804.5 (2007).

> The person making the arrest must inform the person to be arrested of the intention to arrest the person, the reason for arrest, and that the person making the arrest is a peace officer, if such be the case, and require the person being arrested to submit to the person's custody, except when the person to be arrested is actually engaged in the commission of or attempt to commit an offense, or escapes, so that there is no time or opportunity to do so . . . .

Iowa Code § 804.14.[7]

---

[6]The definitions of arrest contained in sections 804.5 and 804.14 (and their predecessors) are not used solely to determine whether a person has been arrested for speedy indictment purposes. They have been relied upon to determine whether an arrest has occurred when someone is charged with escape from custody in violation of section 719.4, *State v. Breitbach*, 488 N.W.2d 444, 446–47 (Iowa 1992); whether a search was incident to arrest, *State v. Nucaro*, 614 N.W.2d 856, 859 (Iowa Ct. App. 2000); whether a person is guilty of resisting arrest, *State v. Yates*, 243 N.W.2d 645, 648–49 (Iowa 1976); whether a person has properly used force in response to an attempt to arrest him, *State v. Thomas*, 262 N.W.2d 607, 611 (Iowa 1978), *State v. Frink*, 255 Iowa 59, 66, 120 N.W.2d 432, 437 (1963); whether a person has been arrested so that implied consent procedures must be followed, *Dennison*, 571 N.W.2d at 495, *State v. Ransom*, 309 N.W.2d 156, 158–59 (Iowa Ct. App. 1981); and whether defendants in a civil suit are liable for false imprisonment, assault and battery, *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 768–69 (Iowa 2002).

[7]It has been suggested that the "held to answer" framework of the pre-1977 Code survived the 1976 amendments. We do not agree. We acknowledge that under the former Iowa Criminal Code, the speedy indictment timeline began to run when the defendant was "held to answer" for a public offense. *See* Iowa Code § 795.1 (1975). The concept of "held to answer" under the 1975 Code was unrelated to physical restraint of the defendant and was related instead to the point at which the defendant was charged and held, physically or in a legal sense, to answer the charge. Notably, the 1976 Criminal Code revision abandoned the "held to answer" language found in former Iowa

Despite the seemingly rigid notification requirements described in section 804.14, we have consistently acknowledged that not all seizures by law enforcement officers must meet such strict conditions to constitute an arrest. "No formal announcement is required, as long as [the person making the arrest] sufficiently conveys, either through words or conduct, the intent to perform a[n] . . . arrest." *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 769 (Iowa 2002). While formal words are not required, what a suspect is told or not told about his arrest status is a factor to be considered when determining whether an arrest has occurred. *See State v. Rains*, 574 N.W.2d 904, 910 (Iowa 1998). We also consider whether a person has been handcuffed or booked, but neither of these factors is determinative. *Dennison*, 571 N.W.2d at 495. Further, the "mere submission to authority" does not result in an arrest, *id.* at 494–95, and the question of whether an arrest has occurred does not turn solely on whether a reasonable person would have felt free to leave during the encounter. *State v. Johnson-Hugi*, 484 N.W.2d 599, 601 (Iowa 1992). Thus, the test for determining whether an arrest occurred under sections 804.5 and 804.14 is not coterminous with the standard used to determine whether a person has been seized for Fourth Amendment purposes. *Id.*

> What can be gleaned from [our] cases is that the question of whether a defendant was 'arrested' is determined on a case-by-case basis. There is no bright-line rule or test. These basic principles assist us, but are not determinative.

---

Code section 795.1. A new speedy trial trigger—the "arrest"—was substituted in its place. We believe the substitution of "arrest" for the former statutory "held to answer" formulation signaled a substantive departure from the former standard, not merely the substitution of a new word meaning the same thing. When legislators used the word "arrested" in what is now rule 2.33, we assume they were aware of the meaning attributed to the word "arrest" in other contexts under Iowa law. *State v. Aldape*, 307 N.W.2d 32, 35 (Iowa 1981) ("We assume that the . . . legislature was familiar with the existing state of the law.").

*Dennison*, 571 N.W.2d at 495.

In *Johnson-Hugi,* we also noted that " 'an assertion of authority and *purpose to arrest* followed by submission of the arrestee constitutes an arrest.' " 484 N.W.2d at 601 (quoting *California v. Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690, 697 (1991)). This language could be understood as grafting an additional requirement onto sections 804.5 and 804.14 that an officer possess an intent to arrest. *See Rains,* 574 N.W.2d at 911 ("Although Rains did ultimately submit to [the officer's] authority [after being shot and having a gun held to his head], without evidence of a purpose to arrest, we cannot find an arrest occurred that night."); *Delockroy,* 559 N.W.2d at 46 ("[W]e look to determine if the facts reveal an assertion of authority and purpose to arrest, together with a submission of the arrestee."). However, neither section 804.5 nor 804.14 explicitly requires an assessment of the officer's subjective intent to determine if an arrest has occurred. Rather, section 804.14 requires notice to the arrestee that he or she is being arrested, specifically that the officer "inform the person to be arrested of the intention to arrest the person . . . [unless] there is no time or opportunity to do so." Iowa Code § 804.14. Given the broad range of contexts in which the arrest statutes are utilized, we think the notice requirement is designed to do just that—provide notice to an arrestee that he or she is being arrested unless the situation is such that it is obvious to the arrestee that he or she is being arrested.[8]

---

[8]The question posed in *Hodari D.* was not whether a suspect had been formally arrested, but rather whether he had been seized for Fourth Amendment purposes. 499 U.S. at 623, 111 S. Ct. at 1549, 113 L. Ed. 2d at 695. The specific question at issue was whether Hodari had been seized when an officer chased him on foot but never touched him. *Id.* As the Supreme Court considered whether physical contact was required to effect a seizure, it looked to common law principles of arrest and quoted the language which was later relied upon in *Johnson-Hugi. Id.* at 626, 111 S. Ct. at 1550–51, 113 L. Ed. 2d at 697. As the Court was concerned with whether the officer had

When an arresting officer does not follow the protocol for arrest outlined in section 804.14 and does not provide any explicit statements indicating that he or she is or is not attempting to effect an arrest, we think the soundest approach is to determine whether a reasonable person in the defendant's position would have believed an arrest occurred, including whether the arresting officer manifested a purpose to arrest.[9]   Viewing the events surrounding an alleged arrest from this perspective is consistent with the way courts analyze whether a person has been seized for Fourth Amendment purposes.  *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317, 336 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation."); *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir. 1988) ("A suspect is . . . 'in custody' for *Miranda* purposes when . . . a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with a formal arrest."); *People v. P.*, 233 N.E.2d 255, 260 (N.Y. 1967) (adopting a test that concludes custody occurs if the suspect is restrained in any significant way or reasonably believes he has been so restrained because

_____

obtained custody of Hodari for Fourth Amendment purposes, the Court did not discuss what constitutes a "purpose to arrest" or the relevance of an officer's subjective intent to the determination of whether a formal, statutory arrest has occurred.

[9]We do not think the clarification that an officer's actual subjective intent is not critical to the determination of whether an arrest has occurred and that whether a purpose to arrest exists should be viewed from the perspective of a reasonable person in the defendant's position would have changed the result in *Johnson-Hugi*.  The court concluded Johnson-Hugi had not been arrested because at the beginning of her encounter with undercover officers she was given a choice between being arrested or cooperating with law enforcement.  484 N.W.2d at 601.  She chose to cooperate which precluded any reasonable understanding that she was being arrested.  *Id.*

"it is not solely dependent either on the self-serving declarations of the police officers of [sic] the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question").

It has been suggested that the meaning of "arrest" in our speedy indictment rule should be conformed to the meaning of "arrest" under the federal speedy indictment rule. We disagree. Although the federal speedy indictment statute[10] was adopted in 1974—two years before the 1976 amendments[11] of the Iowa Criminal Code—there is no evidence the general assembly intended to conform the Iowa speedy indictment rule to the federal rule. Although both the Iowa and the federal provisions utilize the word "arrested," that is the beginning and the end of the similarity between the two provisions. Certainly the very core of the federal rule adopted in 1974 is the time allotted to the government to file criminal charges—thirty days. 18 U.S.C. § 3161(b) (2006). However, our general assembly chose a deadline of forty-five days, rejecting the core of the federal framework and evidencing a disinclination to follow the federal model in lockstep. Thus, based on the language of rule 2.33(2)(*a*) alone, any suggestion that the federal speedy indictment regime was "the pattern" for the Iowa rule is suspect.[12]

---

[10]The federal speedy indictment rule provides in relevant part:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

18 U.S.C. § 3161(b) (2006).

[11]The Iowa Criminal Code was enacted in 1976, but it did not become effective until January 1, 1978. *See* 1976 Iowa Acts ch. 1245.

[12]Further, despite claims to the contrary, there is no evidence of a longstanding, special meaning of "arrest" in federal law that is congruent with the former "held to answer" language of Iowa's former speedy-indictment statute. Federal court decisions interpreting the federal speedy indictment rule and interpreting "arrested" for speedy

Despite rule 2.33's explicit policy statement favoring speedy prosecutions, we have acknowledged competing policy considerations in our decisions, particularly in a situation, such as this one, where police seek cooperation from a suspect to advance other investigations.

> Law enforcement authorities must be accorded latitude in procuring the non-volunteer assistance of private citizens to serve as confidential informants in combating crime. If every such action were deemed to be an "arrest" for purposes of rule [2.33(2)], the time within which authorities could use informants to obtain information would be substantially limited. We refuse to hamstring law enforcement authorities by such a rule.

*Johnson-Hugi*, 484 N.W.2d at 602.

Although we recognize the importance to law enforcement of cooperation from suspects involved in criminal activity, we conclude the purposes of the speedy indictment rule need not be sacrificed to secure it. As Justice Snell noted in his dissent in *Johnson-Hugi*, the fear that law enforcement will be "hamstrung" by the speedy indictment rule seems "overblown" because, notwithstanding enforcement of the rule, law enforcement officers can use informants for as long as they wish. *Id.* at 603 (Snell, J., dissenting). They need only determine within forty-five days "whether their informant is capable and willing to provide the information that they desire." *Id.* Further,

> [i]f law enforcement [officers] desire to utilize cooperation agreements after an arrest, and to delay the filing of charges pending completion of the agreement, a waiver of the speedy indictment rule can be requested as part of the cooperation agreement.

*Delockroy*, 559 N.W.2d at 47.

---

indictment purposes filed *after* the 1976 revision of Iowa's criminal code surely did not inform the drafters as to the meaning of the term "arrest." Instead we find it more likely the Iowa legislature was familiar with and influenced by definitions of "arrest" that already existed in Iowa law. *See* Iowa Code §§ 755.1, .2, and .7 (1975); *see also State v. Medina*, 165 N.W.2d 777, 782 (Iowa 1969); *Frink*, 255 Iowa at 66–67, 120 N.W.2d at 437.

With these principles in mind, we shall briefly review the relevant caselaw to identify the types of facts and circumstances that our appellate courts have deemed to constitute an arrest for speedy indictment purposes. In *Johnson-Hugi,* undercover officers met Johnson-Hugi at her house to purchase drugs. 484 N.W.2d at 599. The officers identified themselves and gave Johnson-Hugi a choice between becoming a confidential informant and being arrested. *Id.* at 600. Johnson-Hugi agreed to cooperate. *Id.* The officers then patted her down, searched her purse, and drove her to the police station. *Id.* At the station, she received *Miranda* warnings, filled out paperwork "confirming her status as a 'cooperating individual,' " and was returned to her home. *Id.* Because Johnson-Hugi had been presented with the choice of cooperation or arrest at the beginning of her encounter with law enforcement, we determined her decision to cooperate "necessarily precluded the possibility of there being an 'arrest.' " *Id.* at 601. Accordingly, we concluded she had not been arrested. *Id.* at 602.

In *Smith,* the court of appeals also concluded a defendant who agreed to cooperate had not been arrested. *Smith,* 552 N.W.2d at 166. Officers obtained a search warrant for the home Smith shared with his girlfriend. *Id.* at 164. When they arrived at the house to execute the warrant, the officers handcuffed Smith as he attempted to block their entry. *Id.* After the search revealed incriminating evidence, Smith offered to cooperate in exchange for leniency. *Id.* The officers told Smith he was "facing charges for possession with intent to deliver and they were taking him to the station to straighten it out." *Id.* At the station, Smith received *Miranda* warnings and provided the officers with information about his drug supplier. *Id.* After the supplier's home was searched pursuant to a search warrant, Smith was allowed to leave the

station.  *Id.*  Concluding that Smith's transportation to and detention at the police station was incidental to the cooperation agreement, the court of appeals concluded Smith had not been arrested.  *Id.* at 166.[13]

However, in *Delockroy*, a case involving the same events described above in *Smith,* the court of appeals concluded Delockroy was arrested for speedy indictment purposes despite her boyfriend's cooperation agreement.  559 N.W.2d at 46.  Delockroy was handcuffed at the same time as Smith when police forced their way into the house to execute a search warrant.  *Id.* at 44.  Although Smith spoke with the officers and offered to cooperate during the search, Delockroy did not participate in the conversations.  *Id.*  Delockroy and Smith were transported to the police station in separate vehicles.  *Id.*  Delockroy's handcuffs were removed after she arrived at the station, and she was read her *Miranda* rights and placed in a room by herself.  *Id.*  Although Smith negotiated an agreement providing for reduced charges against Delockroy in exchange for his cooperation, Delockroy did not take part in the discussions between Smith and law enforcement.  *Id.*  She was ultimately released with Smith several hours later.  *Id.*  Because police had probable cause to arrest her, because she had been transported to the police station against her will, and because she was not actively seeking to work out a deal with the police herself, the court of appeals concluded she had been arrested under these circumstances.  *Id.* at 46.[14]

---

[13]The court of appeals did not rely on the "purpose to arrest" language of *Johnson-Hugi* to determine that Smith was not arrested.

[14]Although as in *Johnson-Hugi* the court of appeals did consider whether there was evidence of a "purpose to arrest," we do not think the determination that Delockroy was arrested turned on that question.  Rather the critical facts, as articulated by the court of appeals, would have led a reasonable person in Delockroy's position to believe she was arrested.

In reviewing the circumstances surrounding Wing's interaction with law enforcement on July 7, 2007, we conclude that, despite the fact that late in the encounter there was some discussion about future cooperation, a reasonable person in Wing's position would have believed an arrest had occurred. A car he was traveling in was subject to a routine traffic stop. Wing cooperated with the officer conducting the stop, providing identification, submitting to a pat down search, and complying with a request to wait on the sidewalk while the vehicle was searched. When a large brick of marijuana was discovered in the course of the search, Wing admitted ownership of the contraband and was immediately handcuffed, Mirandized, searched again, and placed in the back of the patrol car. There was no discussion up to that point, as there was in *Johnson-Hugi,* as to the prospect of his cooperation in other drug investigations, and Wing had not been given a choice between being arrested and cooperating with law enforcement.[15] 484 N.W.2d at 600. At this point in the encounter, Wing was not even aware that there were other officers involved in the operation. When Detective Proehl arrived and spoke with him, Wing agreed to let the officers search his house.[16]

---

[15]Further, unlike *Smith*, who had been handcuffed at the beginning of his encounter with law enforcement because he was being uncooperative and violent, 552 N.W.2d at 164, Wing was Mirandized, handcuffed, and searched immediately upon his admission of ownership of a large quantity of marijuana. Officer Schertz testified that he handcuffed Wing for safety reasons and because he was afraid he might try to run. However, despite this claim, we note that while both Officer Schertz and Wing knew there was contraband in the trunk of the car, Wing was completely cooperative during the entire encounter. Officer Schertz had previously turned his back on Wing and implicitly trusted him to stand on the sidewalk while he searched the vehicle. Schertz had also already conducted one pat down of Wing to determine he was not carrying a weapon.

[16]Officer Schertz asked Detective Proehl if Wing was a "10-59" just before he transported Wing to his house, and Proehl replied that he was. Even assuming Wing understood the police code used, it was too late to "unarrest" Wing. *See State v. Davis*, 525 N.W.2d 837, 840 (Iowa 1994) (holding that a person cannot be arrested and later "unarrested" to stop the tolling of the speedy indictment clock).

However, there was still no discussion up to that point of Wing's cooperation as an informant in other drug crime investigations. Officer Schertz had already exerted his authority, objectively evidencing a purpose to arrest, and Wing had submitted to that authority before Proehl arrived at the scene. *See Johnson-Hugi*, 484 N.W.2d at 601.

There is evidence in the record tending to prove Detective Proehl and the members of the Tactical Operations Bureau who had been investigating Wing planned to arrest Wing only if his cooperation in other investigations could not be secured. Even if we credit this evidence, however, it is not dispositive because the subjective intent of Detective Proehl and his colleagues is not controlling in the determination of whether a reasonable person in Wing's position would have believed he had been arrested. Any conditional plan to arrest Wing only if he refused to serve as an informant was apparently not communicated to Officer Schertz, nor was it communicated to Wing before he was Mirandized, searched, handcuffed, and placed in the patrol car upon his admission of ownership of the brick of marijuana.

At some point either during or after the search of the house where more evidence incriminating Wing was found, Detective Proehl finally brought up the subject of cooperating with law enforcement on other investigations in the area. Although Wing expressed a general willingness to cooperate, no formal paperwork was completed "confirming [Wing's] status as a 'cooperating individual.' " *Id.* at 600. Rather, Wing was given Officer Proehl's business card and told to "give [him] a call."[17] Wing was given no guidance as to what was expected of him to avoid

---

[17]We note that the district court concluded Officer Proehl "gave [Wing] his cell phone number, and told him they would call him." However, both Proehl and Wing testified conversely that Proehl told Wing to call him.

prosecution for the crimes to which he had admitted.[18] And although Wing did not call Detective Proehl, Proehl waited five months before obtaining an arrest warrant and pursuing charges against Wing.

As the court of appeals noted in *Delockroy*, if officers enter into cooperation agreements after an arrest, they may certainly include a waiver of the speedy indictment rule as part of the agreement. 559 N.W.2d at 47. In this case, no formal agreement was ever reached which might have included a speedy indictment waiver. Given that Wing never called Proehl, law enforcement officers had forty-five days of unresponsiveness in which to determine that Wing's cooperation might fall short of their expectations and to secure a waiver of the speedy indictment rule or cause an indictment to be filed. We do not think forty-five days during which no communication was received from Wing was insufficient to assess Wing's willingness to cooperate in a manner satisfactory to law enforcement. Accordingly, we conclude enforcement of the speedy indictment rule would not "hamstring" law enforcement under the circumstances presented here.[19] The speedy indictment rule and "the fourth amendment share a kinship in that the fourth amendment's proscription on unreasonable seizures is designed 'to

---

[18]It is not clear what Wing was promised, if anything, in exchange for his cooperation. The extent of the evidence in the record is that Wing expressed a willingness to "help . . . with other drug investigations in the Davenport area or the Scott County area." Although we have concluded that Wing was arrested before he was transported to his house for the search, even if we take into consideration the rest of the events of the evening and conversation regarding cooperation, we are not convinced that the terms and implications of the cooperation arrangement were clear enough to relieve a reasonable person in Wing's position of the belief that he had been arrested that night.

[19]In fact, a rule enforcing the time requirements imposed by the speedy indictment rule in the absence of a formal cooperation agreement waiving the suspect's right under the rule also arguably motivates the suspect to cooperate quickly to avoid prosecution or suffer the consequences.

prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Johnson-Hugi*, 484 N.W.2d at 603 (Snell, J., dissenting) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081, 49 L. Ed. 2d 1116, 1126 (1976)). We conclude the rule was violated here and therefore reverse Wing's conviction.

## IV. Conclusion.

We conclude Wing was arrested on July 7, 2007, for speedy indictment purposes, and the trial information filed in January 2008 was untimely. The district court erred by denying Wing's motion to dismiss. Accordingly, we vacate the decision of the court of appeals, reverse the conviction, and remand for entry of a dismissal.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Cady, J., who dissents.

**CADY, Justice (dissenting).**

I respectfully dissent. Statutes and rules must only be applied to circumstances intended to be within their purview. The speedy-trial rule was never intended to apply when a person is detained by police at a roadside encounter for suspected criminal conduct but released at the scene without being told he was under arrest, without being transported to the police station for processing and appearance before a magistrate, without being charged with a criminal offense, without being subjected to the other processes of the prosecution of a crime, and without any disruption and burden associated with a criminal prosecution. The majority has misapplied the definition of an arrest under the speedy-indictment rule by failing to appreciate that an arrest takes on a different meaning in the context of the right to a speedy trial.

The starting point to interpret the speedy-indictment rule begins with the context in which the rule was conceived. *See State v. Kamber*, 737 N.W.2d 297, 299 (Iowa 2007) (recognizing statutes must be interpreted in their context because words can have different meanings in different contexts). Like the federal speedy-indictment rule, the purpose of Iowa's speedy-indictment rule was to implement the constitutional right to a speedy trial. *State v. Cennon*, 201 N.W.2d 715, 718 (Iowa 1972); *see also United States v. MacDonald*, 456 U.S. 1, 7 n.7, 102 S. Ct. 1497, 1501 n.7, 71 L. Ed. 2d 696, 703 n.7 (1982) (recognizing the Speedy Trial Act of 1974 was intended " 'to give effect to the [S]ixth [A]mendment right to a speedy trial' " (quoting S. Rep. No. 93–1021, at 1 (1974))); *United States v. Hillegas*, 578 F.2d 453, 456 (2d Cir. 1978) (recognizing the Speedy Trial Act of 1974 was intended to implement the constitutional right to a speedy trial).

A "literal reading" of the constitutional right to a speedy trial reveals the right "attaches only when a formal criminal charge is instituted and a criminal prosecution begins." *MacDonald*, 456 U.S. at 6, 102 S. Ct. at 1501, 71 L. Ed. 2d at 702. This reading is the same for the right to a speedy trial under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution because the operative language of the two provisions is the same. Both constitutional provisions provide that in "all criminal prosecutions" the "accused" shall have a "right to a speedy . . . trial." As observed by the United States Supreme Court:

> On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been "accused" in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The [A]mendment would appear to guarantee to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him.

*United States v. Marion,* 404 U.S. 307, 313, 92 S. Ct. 455, 459, 30 L. Ed. 2d 468, 474 (1971). Consequently, "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision." *Id.* at 320, 92 S. Ct. at 463, 30 L. Ed. 2d at 479. Importantly, this approach is what the speedy-indictment rule sought to implement. Accordingly, the language of Iowa's speedy-indictment rule must be interpreted in the context of that point in time when a person becomes an "accused" in a criminal prosecution, not the point when a person is in police custody in such a way that a reasonable person would believe he or she is under arrest. An

interpretation of an arrest based on a custodial setting is appropriate in implementing the rights against self-incrimination and the right to counsel, but not in implementing the right to a speedy trial. *Compare State v. Evans*, 495 N.W.2d 760, 762 (Iowa 1993) (right to counsel attaches when defendant is interrogated in police custody due to risk of self-incrimination in an inherently coercive environment), *with State v. Gathercole*, 553 N.W.2d 569, 573 (Iowa 1996) (rejecting the argument that a de facto arrest due to confinement by authorities triggers running of time for speedy trial). The rights serve different purposes and must be interpreted in light of those purposes. In other words, a rule implementing a constitutional right must be interpreted consistently with the aim and purpose of the particular constitutional right implemented.

The right to a speedy trial was designed to minimize the fears and burdens associated with a criminal prosecution, not those associated with a brief detention of a person by police for suspected criminal conduct that gives rise to fears of a future criminal prosecution. The speedy-trial right exists primarily

> to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald*, 456 U.S. at 8, 102 S. Ct. at 1502, 71 L. Ed. 2d at 704. Similarly, the speedy-indictment rule exists to " 'expedite the processing of *pending* criminal proceedings.' " *United States v. Varella*, 692 F.2d 1352, 1358 n.4 (11th Cir. 1982) (quoting *Hillegas*, 578 F.2d at 456). It does not exist to "supervise the exercise by a prosecutor of his investigative or prosecutorial discretion at a time when no criminal proceeding is pending before the court." *Hillegas*, 578 F.2d at 456. The

government has traditionally been given substantial discretion under the separation-of-powers doctrine in decisions relating to the timing of an arrest. *See United States v. Mays,* 549 F.2d 670, 678 (9th Cir. 1977).

Originally, Iowa's speedy-indictment rule was written to make it clear that the time for the filing of the indictment was not triggered the moment a person reasonably believed an arrest had occurred. The rule first arose by statute and was triggered when a person was "held to answer" for a public offense. *See* Iowa Code § 795.1 (1975). The "held to answer" standard essentially meant the person was held to answer by a preliminary examination. *State v. Montgomery,* 232 N.W.2d 525, 526–27 (Iowa 1975). The concept of "held to answer" was unrelated to physical restraint, but concerned the appearance in court to answer the charge. *See Bergman v. Nelson,* 241 N.W.2d 14, 16 (Iowa 1976). Thus, the speedy-indictment rule was triggered based on circumstances that occurred within the court proceedings that started the criminal prosecution and supported the obligation of the state to properly proceed to trial or dismiss the charges. It was a straightforward approach, unrelated to conflicting facts and circumstances that can surround a warrantless arrest.

In 1976, our legislature repealed the statutory speedy-trial provisions when it established separate rules of criminal procedure to govern court proceedings. *See* 1976 Iowa Acts ch. 1245, § 1301, r. 27 (codified at Iowa Code ch. 813, r. 27 (1979)) (establishing the Iowa Rules of Criminal Procedure, including speedy-indictment rule). In doing so, it adopted the speedy-trial dismissal rules as a part of the rules of criminal procedure, patterned largely on the federal speedy-trial rule. *See* 4 John L. Yeager & Ronald L. Carlson, *Iowa Practice: Criminal Law and Procedure* § 1242, at 298 (1979) [hereinafter Yeager & Carlson]. The

federal rule triggered the speedy-indictment requirement from the date of arrest or the filing of a formal charge against an accused, whichever occurred first. *Hilbert v. Dooling*, 476 F.2d 355, 357 (2d Cir. 1973). Iowa followed this approach by adopting the arrest for the commission of a public offense as the triggering event for the filing of an indictment. *See* Iowa Code ch. 813, r. 27(2) (1979).

Nevertheless, an arrest within the context of the federal speedy-trial rule has always entailed an accusation so that an "arrest" under the Federal Act is the point at which a defendant is first charged and held, physically or in a legal sense, to answer for a charge. *See United States v. Sayers*, 698 F.2d 1128, 1130–31 (11th Cir. 1983). As a rule implementing the constitutional right of an accused to a speedy trial, federal courts have taken the approach that the speedy-indictment time restraints were not triggered until a defendant was "the subject of formal proceedings." *Hillegas*, 578 F.2d at 457. Likewise, the legislative history of the Federal Act reflects that Congress proceeded on the "assumption . . . that any arrested individual would also be a 'charged' or 'accused' individual." *United States v. Jones*, 676 F.2d 327, 331 (8th Cir. 1982). Accordingly, courts have uniformly held that "an arrest or summons standing alone [is] not enough to trigger the time limitations of the Speedy Trial Act." *United States v. Francis*, 390 F. Supp. 2d 1069, 1071 (N.D. Fla. 2005).

Thus, the Iowa legislature adopted its speedy-indictment rule by using the "arrest" language of the Federal Act, which had a clear, special meaning compatible with the former "held to answer" language of Iowa's statutory speedy-indictment rule. Moreover, there is no indication the Iowa legislature otherwise sought to alter the speedy-indictment approach when it repealed the statute and adopted the rule. *See* Yeager

& Carlson at 298–99 (stating the Iowa rule followed "an approach not dissimilar from [the] former" statute). Instead, the legislature was merely bringing its rule in line with the federal approach.

Today, the majority repeats an error that began thirty years ago following the adoption of the speedy-indictment rule. The facts of this case simply make the error much more obvious. Instead of giving the word "arrest" the full meaning it was intended to have when the rule was adopted, we have somehow fallen off track by defining the word in the context of police custody viewed through the eyes of a reasonable person. We presumed, incorrectly, that an arrest had but one meaning. As a result, we are likely the only jurisdiction in the nation to trigger the requirement to file an indictment based on a case-specific, fact-intensive analysis of when police action rises to the level of an arrest. Moreover, this approach has resulted in a host of conflicting decisions in which "[w]hat is characterized by police as a non-arrest is occasionally found to constitute an arrest, and vice versa." 4A B. John Burns, *Iowa Practice Series: Criminal Procedure* § 7:3, at 77 (2005). The analysis followed by the majority totally ignores the absence of any charges and disregards the purposes of speedy indictment. Not only is such a loose standard unnecessary and detached from the purpose and aim of the right to a speedy trial, it is largely unprincipled and capable of inconsistent results. *See, e.g.*, *id.* § 7:3, at 77–80 (describing numerous cases in Iowa in which the standard rendered inconsistent application); *compare State v. Davis*, 525 N.W.2d 837, 839 (Iowa 1994) (applying rule to OWI, first offense, prosecution to deny State's request to toll indictment period, even though defendant was released without charges), *with State v. Lasage*, 523 N.W.2d 617, 620 (Iowa Ct. App. 1994) (applying rule to first-degree

murder prosecution to toll the speedy-indictment period when defendant was released without charges).

The error by the majority can perhaps be best revealed by the unimaginable reversal of roles created by its analysis. The majority literally places the power to commence a criminal prosecution in the hands, or mind, of the accused. Under the analysis by the majority, the reasonable belief of a person detained by police that he or she has been arrested for an unnamed criminal act forces the prosecutor to expeditiously bring an indictment against the person, even though the prosecutor never wanted to indict the person and the police never wanted to initiate a criminal prosecution. This is the type of circumstance that results when rules and statutes become disconnected from their purpose and intent.

In this case, Wing was never subjected to the burdens sought to be protected by the speedy-trial guarantee. When he was taken home instead of taken to the police station, he was "in the same position as any other subject of a criminal investigation." *MacDonald*, 456 U.S. at 8–9, 102 S. Ct. at 1502, 71 L. Ed. 2d at 704. Although the event may have caused "stress, discomfort, and perhaps a certain disruption in normal life," he was "not impaired to the same degree as . . . after [an] arrest while charges are pending." *Id.* at 9, 102 S. Ct. at 1502, 71 L. Ed. 2d at 704. His situation did " 'not compare with that of a defendant who has been arrested and held to answer.' " *Id.* (quoting *Marion*, 404 U.S. at 321, 92 S. Ct. at 464, 30 L. Ed. 2d at 479). He was in the same position as any other person under investigation for a criminal offense whose right to a speedy indictment has not yet attached. *Id.* at 8–9, 102 S. Ct. at 1502, 71 L. Ed. 2d at 704. Moreover, any actual prejudice due to any delay by the prosecution in later bringing charges is a separate issue

fully protected "by the Due Process Clause and by statutes of limitations." *Id.* at 8, 102 S. Ct. at 1502, 71 L. Ed. 2d at 704.

Finally, even assuming the legislature did intend to create a unique speedy-indictment rule triggered by the point in time in which a reasonable person believed an arrest had occurred, the record clearly shows no such arrest took place. For sure, a reasonable person who would have observed Wing being removed from the car after the police discovered drugs in the trunk, placed in handcuffs, read his *Miranda* rights, and even placed in the backseat of the police vehicle would reasonably believe an arrest had occurred. Yet, the reasonable-person test considers all the relevant facts and circumstances. *See, e.g., State v. Bogan,* 774 N.W.2d 676, 680 (Iowa 2009) (recognizing the reasonable-person custody determinations for purposes of *Miranda* involve an objective analysis of all the facts and circumstances); *State v. Delockroy,* 559 N.W.2d 43, 46 (Iowa Ct. App. 1996) (examining all facts and circumstances of police encounter to determine whether an arrest occurred). In this case, a reasonable person with knowledge of the rest of the story surrounding the stop would conclude differently. The remainder of the facts and circumstances that complete the story of Wing's police encounter are that the police had no intention or desire to use the roadside stop to make an arrest but only wanted to establish a relationship with Wing, who was known by police to be involved with drugs, which might benefit an ongoing community task force operation. Furthermore, a reasonable person viewing the totality of this encounter would also know Wing was not told at any time he was under arrest or that he would be charged with a crime, and that Wing was transported to his home from the roadside stop to continue to go on with his life without the burdens associated with a criminal prosecution. *See* Iowa Code

§ 804.14 (2007) (requiring a person making an arrest to "inform the person to be arrested of the intention to arrest"); *id.* § 804.22 (requiring a person placed under arrest to be brought before a magistrate without unnecessary delay). The majority failed to consider the totality of the circumstances, which clearly show Wing was never arrested. Instead, Wing was detained and released without being subjected to the process of the criminal justice system that accompanies an arrest.

This case was an opportunity to correct a mistake and make the law conform to its purpose and aim. I dissent because it was an opportunity we should have taken.