**STATE of Iowa, Plaintiff–Appellant,**

v.

**Brian David MILLER, Defendant–Appellee.**

No. 11–1420.

Court of Appeals of Iowa.

June 13, 2012.

the trial information did not violate the speedy indictment rule. The success of that challenge hinges on whether Miller was "arrested" for OWI on the same day he was cited for interference with official acts.

Finding the result was dictated by the supreme court's interpretation of Iowa Rule of Criminal Procedure 2.33(2)(a) in *State v. Wing,* 791 N.W.2d 243 (Iowa 2010), the trial court decided a reasonable person in Miller's position would have believed he was under arrest for OWI and, accordingly, dismissed the belated trial information. This appeal requires us to consider how *Wing* applies to a situation where law enforcement arguably had probable cause to place the defendant under arrest for more than one offense.

Because officers manifested a purpose to arrest Miller for interference with official acts by issuing him a citation for that offense, but did not communicate an intention to arrest him for OWI, we conclude a reasonable person in Miller's position would not have believed he had been taken into custody on that second offense. Accordingly, we reverse.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Stephen Holmes, County Attorney, and Nicole Proesch, Assistant County Attorney, for appellant.

Brian Miller, Mason City, pro se appellee.

Considered by VOGEL, P.J., and TABOR and BOWER, JJ.

TABOR, J.

The State appeals from the dismissal of Brian Miller's operating while intoxicated (OWI) charge, asserting that the timing of

## I. Background Facts and Procedures

On October 15, 2010, at around 5:30 p.m., Iowa State Patrol Trooper Brett Tjepkes saw a silver Chrysler sedan with severe front-end damage traveling south on Interstate 35. The trooper had earlier received a dispatch concerning a hit-and-run accident in the vicinity. He followed the car as it wove back and forth in the left-hand lane and pulled the vehicle over around mile marker 105 near Ames. Trooper Tjepkes observed that the driver, Brian Miller, "showed obvious signs of intoxication and impairment." Miller appeared to have urinated on himself, slurred and mumbled when he spoke, ap-

peared disoriented, and smelled like alcoholic beverages.

Miller barely pulled onto the right-hand shoulder of the road, leaving only a slight distance between his vehicle and the passing traffic. For safety reasons, Trooper Tjepkes asked Miller to shift to the passenger side so that their encounter would be away from the rush-hour congestion. The trooper also called for assistance from the Story County Sheriff's Department.

While the trooper was asking Miller if he had been using alcohol or drugs, Miller tried to open a pack of cigarettes. Because he was concerned that cigarette smoking could skew a breath test, Trooper Tjepkes warned Miller several times not to smoke and to put the pack down. Miller ignored him and continued reaching for a cigarette. As Trooper Tjepkes tried to confiscate the pack, Miller grabbed and struck the trooper's hand. The trooper pulled Miller out of the vehicle, took him to the ground, and handcuffed his hands behind his back.

As the trooper walked Miller to the back of his squad car, Story County Deputy Sheriff Nicholas Lennie arrived on scene. Deputy Lennie noted heavy damage to the front and slight damage to the back of Miller's vehicle, and observed that Miller appeared intoxicated. After Trooper Tjepkes relayed the earlier events to him, Deputy Lennie agreed to take Miller to the Story County jail. Miller's face was scraped from being forced to the ground; he complained of "nose pain" and requested medical attention. Miller also told the deputy that he had drugs, which had been prescribed to him, in his car. After reading Miller his *Miranda* rights, Deputy Lennie transported him to the Story County Medical Center.

Miller grew belligerent after his arrival at the hospital. As staff began screening him, he refused to cooperate and seemed confused. Deputy Lennie cuffed Miller's arms to the bed rails and restrained him as he continued to flail on the bed. Miller threatened to hurt or kill the staff. When the medical technicians requested a urine sample, Miller continued to resist and refuse, despite repeated explanations that this sample was for medical purposes and law enforcement would not have access to it. After the medical staff inserted an IV into his left arm, Miller tried to pull it out with his teeth. Deputy Lennie reiterated that the tests were for medical purposes alone, and that they would not be used in a prosecution.[1] Because of Miller's continued refusal, staff catheterized him to obtain a urine sample, relying on deputies to hold down his legs. Miller repeated that he was "fucked up," had been drinking, and said several times he would test positive for marijuana use. Staff also performed a CT scan, during which Miller again had to be restrained because of his physical resistance. Throughout his screenings he threatened medical personnel, was combative, and struggled to get free.

Deputy Lennie tried to read him the implied consent advisory, but Miller interrupted with statements that made "absolutely no sense." Deputy Lennie believed Miller was incapable of understanding the advisory that was read to him. He could not carry on a dialogue with the deputy.

---

1. In his hearing testimony, Deputy Lennie described his communication with Miller:

I wanted to make it clear to him that—that it was for purposes of medical treatment, that we were not—we did not have any—we were not going to get that information, that it was just for his health to make sure he was safe. I just wanted him—my main concern at that point was that his safety—if there was something medical—medically going on with him, I didn't want him to refuse treatment just because he thought we were going to get results on this test.

When asked whether he would sign the form, he answered in the negative. When asked if he was refusing to give a specimen, he said "no. I'm not refusing." The officers and Miller repeated the exchange a few more times. When asked whether Miller wished to speak with legal counsel or family, he responded he had both but refused to give any information or contact them.

Dr. Joshua Rehmann, the on-duty emergency room physician, also testified Miller was more than uncooperative; his conduct showed he was "incapable of making sound medical decisions for himself at that time."[2] The doctor was concerned Miller's involvement in a motor vehicle accident may have resulted in a closed-head injury or some other internal injury that caused Miller to make irrational decisions. On two occasions, hospital staff administered a sedative to help calm Miller.

The law enforcement officers decided to ask Dr. Rehmann to certify Miller was incapable of consenting to providing a bodily sample at that time. Dr. Rehmann agreed to sign a form stating it was his opinion that Miller was incapable of giving consent.[3]

Around 8:00 that night, medical staff withdrew specimens to turn over to law enforcement. Miller remained resistant. Because Dr. Rehmann felt Miller would not be safe in jail given his medical condition, the doctor suggested overnight hospitalization. The doctor obtained a forty-eight-hour committal order. At about 11:00 p.m., deputies transported Miller to Iowa Lutheran Hospital in Des Moines. Before Miller left the Story County medical center, Trooper Tjepkes issued him a citation for interference with official acts.[4] The record does not show when Iowa Lutheran discharged Miller.

The state crime lab tested specimens of blood and urine taken from Miller. In a toxicology report issued on December 30, 2010, a criminalist documented that Miller's urine specimen screened positive for tetrahydrocannabinol (THC), a psychoactive compound in marijuana. Another lab report dated January 26, 2011, confirmed the presence of THC in Miller's urine specimen. A report dated January 14, 2011, indicated Miller's blood sample showed an alcohol content of .246.

On March 10, 2011, the State filed a complaint charging Miller with OWI, second offense, in violation of section 321J.2, and issued a warrant for his arrest. He was arrested on April 13, 2011, and made an initial appearance the next day. On

---

2. When responding to the court's question whether Miller was refusing medical attention, or whether he was incapable of giving consent, Dr. Rehmann explained:

> At that time I think it was difficult for us to—for myself to discern if this was just him not wanting to cooperate or him being unable to cooperate. I think later on from my standpoint it became more apparent that he was unable to make a rational decision for himself, but not in the initial screening exam. This was in the first 20 minutes that he was in the ER we're talking about, so we don't have a lot of time to evaluate at this point in a trauma situation.

3. Iowa Code section 321J.7 (2009) authorizes a licensed professional to certify that an individual is "unconscious or otherwise in a condition rendering that person incapable of consent or refusal."

4. A complaint and affidavit filed on November 15, 2010 accuses Miller of interference with official acts in violation of section 719.1 in connection with the October 15 incident. The complaint specifies Miller "did physically grab and strike Trooper Brett Tjepkes while investigating Mr. Miller for driving while intoxicated and leaving the scene of a traffic accident." The trooper's accompanying affidavit explained: "Since smoking cigarettes would hinder the OWI investigation, I reached into the vehicle to remove the cigarettes from him."

April 29, 2011, the State filed a trial information charging Miller with OWI, second offense. The information alleged that Miller operated a motor vehicle while under the influence of an alcoholic beverage or other drug or a combination of such substances, or while having a blood alcohol concentration above the legal limit of .08.

Miller's counsel filed a combined motion to dismiss and motion to suppress on June 24, 2011. The motion alleged that Miller was arrested for OWI on October 15, 2010, but the trial information was not filed until April 29, 2011, or 196 days later—well beyond the forty-five-day deadline in rule 2.33(2)(a). The State resisted, alleging that Miller was arrested for interference with official acts on October 15, 2010, but was not arrested for OWI until April 13, 2011—just sixteen days before the county attorney filed the trial information.

The district court dismissed the OWI prosecution on August 10, 2011, concluding the State violated rule 2.33(2)(a). The court relied on *Wing*, 791 N.W.2d at 243 to determine that a reasonable person in Miller's position would have believed an arrest occurred.[5] The State appeals from the dismissal order.[6]

## II. Scope and Standard of Review

■■■ We review speedy indictment dismissals for correction of legal error. *Wing*, 791 N.W.2d at 246. We are bound by the district court's findings of fact, so long as they are supported by substantial evidence. *Id.*

## III. Analysis

### A. Principles Governing Speedy Indictment and Arrests

The State challenges the district court's finding that peace officers arrested Miller for OWI on the same day they arrested him for interference with official acts. It maintains the forty-five-day speedy indictment period on his OWI prosecution did not begin to run until his arrest on April 13, 2011—after the county attorney received the toxicology reports from the state crime lab and filed a preliminary complaint.

■■■ Both the federal and state constitutions guarantee a right to a speedy trial. *See* U.S. Const. amend. XI; Iowa Const art. I, § 10. Our rules of criminal procedure embody this right, providing specific mechanisms to protect citizens from undue delays in being charged and tried for public offenses. *State v. Utter*, 803 N.W.2d 647, 652 (Iowa 2011); *see Ennenga v. State*, 812 N.W.2d 696, 701–02 (Iowa 2012) (tracing Iowa's codification of constitutional right from 1851 legislation to modern-day Iowa Rule of Criminal Procedure 2.33); *State v. Nelson*, 600 N.W.2d 598, 600 (Iowa 1999) (observing the rule of criminal procedure to be more stringent than the constitutional safeguards).

■■■ The rules are intended to relieve an accused person of the anxiety created by a suspended prosecution and afford reasonably prompt administration of justice. *State v. Delockroy*, 559 N.W.2d 43, 46 (Iowa Ct.App.1996). Individuals arrested for an offense will remain anxious as to when "the other shoe will drop" by trial

---

5. The district court mused: "Perhaps the better approach to speedy indictment cases such as this is that which was articulated by Justice Cady in his thorough and well-reasoned dissent in *State v. Wing*. There Justice Cady analyzes the speedy indictment rule in the context in which it was conceived and perhaps

arrives at a different result. Of course this court is bound by stare decisis to follow the holding of the majority of the court."

6. The State filed a brief in support of its appeal. Miller did not file a responsive brief.

information or indictment filed against them. *State v. Davis*, 525 N.W.2d 837, 840 (Iowa 1994). The time limit also aims to minimize impairment of a defense caused by diminished memories or loss of exculpatory evidence. *See Wing*, 791 N.W.2d at 247 (noting this is the most serious type of harm because a defendant's inability to adequately prepare his case "skews the fairness of the entire system").

Rule 2.33 dictates the time frame within which an indictment or trial information must be filed against an individual arrested for committing a public offense:

> When an adult is arrested for the commission of a public offense ... and an indictment is not found against the defendant within 45 days, the court must order the prosecution to be dismissed, unless good cause to the contrary is shown or the defendant waives the defendant's right thereto.

Iowa R.Crim. P. 2.33(2)(a); *see* Iowa R.Crim. P. 2.5(5) ("The term indictment embraces the trial information, and all provisions of law applying to prosecutions on indictments apply also to informations...."). For purposes of speedy indictment under rule 2.33(2)(a), a citation issued in lieu of arrest is deemed an arrest. Iowa Code § 805.1(4).

■ Our cases have held that the speedy indictment rule is activated when a person is arrested for the commission of a public offense and does not extend to different offenses which have not resulted in arrest. *See State v. Edwards*, 571 N.W.2d 497, 499–500 (Iowa Ct.App.1997); *see also State v. Dennison*, 571 N.W.2d 492, 497 (Iowa 1997) (holding a defendant's arrest for driving while revoked and having an open container did not bar the State from filing OWI charge, stemming from the same incident, more than forty-five days later). The fact that police have probable cause to arrest the defendant for another crime does not change the speedy-indict-

ment calculus. *Edwards*, 571 N.W.2d at 500 ("An arrest for one offense based upon probable cause but accompanied by other motives does not convert the arrest into a different offense for purposes of applying the speedy indictment rule.").

Our legislature defined arrest as "the taking of a person into custody when and in the manner authorized by law, including restraint of the person or the person's submission to custody." Iowa Code § 804.5; *see State v. Rains*, 574 N.W.2d 904, 910 (Iowa 1998) (embracing sections 804.5 and 804.14 to define and determine the process of arrest for purposes of rule 2.33). Section 804.14 provides the notifications required to make an arrest:

> The person making the arrest must inform the person to be arrested of the intention to arrest the person, the reason for arrest, and that the person making the arrest is a peace officer, if such be the case, and require the person being arrested to submit to the person's custody....

■ Our supreme court has decided that a seizure by a peace officer may constitute an arrest even if the officer does not take the formal steps outlined in section 804.14. *Wing*, 791 N.W.2d at 247–48 ("No formal announcement is required, as long as the person making the arrest sufficiently conveys, either through words or conduct, the intent to perform an arrest." (internal modifications omitted)). Courts must determine on a case-by-case basis whether a seizure constitutes an arrest, considering whether the suspects are informed of their arrest, are handcuffed or booked, submit to authority, or believe they are free to leave. *Id.* at 248. There is no bright-line test; no one factor is determinative. *Id.*

In some instances, an officer may arrest an individual for one offense but not all crimes arising from the same event. This was the case in *Dennison*, where an officer

stopped a driver because his license was revoked, noticed an open can of beer in his vehicle, smelled a slight odor of alcohol, and a much stronger smell of marijuana. 571 N.W.2d at 493. The officer informed the driver he was under arrest for the open container and for driving with a revoked license, asked him if he had been drinking, handcuffed him, read him his *Miranda* rights, and placed him in his patrol car. *Id.* While in the vehicle, the officer administered the horizontal gaze nystagmus test, and a preliminary breath test. *Id.* Although the test revealed a blood alcohol content of only .04, because he smelled marijuana, the officer took the driver to jail so that a drug recognition expert could determine whether he was under the influence of controlled substances. *Id.* The driver voluntarily underwent a series of additional tests at the jail and gave a urine sample after police invoked implied consent. *Id.*

After the hour-long detention at the station, the officer administering the drug test believed Dennison was under the influence of marijuana but did not charge him for drugged driving because he would not receive the toxicology reports for almost three months. *Id.* More than forty-five days after the initial stop, the reports showed the driver tested positive for marijuana, prompting the officer to charge him with OWI. *Id.*

The *Dennison* court recognized that an individual's detention by law enforcement for the purpose of performing field sobriety testing does not rise to the level of custody. *Id.* at 495. Moreover, invoking implied consent under the existing circumstances did not necessitate an arrest. *See id.* (citing section 321J.6(1)(b)-(f) for conditions not requiring an arrest). The court held that despite Dennison's arrests for

driving with a revoked license and open container, he was not arrested for OWI so as to trigger the speedy-indictment deadline. *Id.* at 497.

In 2010, the *Wing* court took the opportunity to speak further on whether an arrest had occurred for speedy indictment purposes. After reiterating that the test for whether an individual is arrested under sections 804.5 and 804.14 "is not coterminous with the standard used to determine whether a person has been seized for Fourth Amendment purposes," the court clarified that the subjective intent of the arresting officer should not play any role in the analysis. *Wing*, 791 N.W.2d at 248–49. The majority advanced that when law enforcement fails to follow the statutory protocol for arrest and does not make explicit statements indicating an attempt to effect an arrest,

> the soundest approach is to determine whether a reasonable person in the defendant's position would have believed an arrest occurred, including whether the arresting officer manifested a purpose to arrest. Viewing the events surrounding an alleged arrest from this perspective in consistent with the way courts analyze whether a person has been seized for Fourth Amendment purposes.

*Id.* at 249. Chief Justice Cady filed a dissenting opinion, lamenting the majority's decision as "literally plac[ing] the power to commence a criminal prosecution in the hands, or mind, of the accused." *Id.* at 257.

While providing guidance on the issue of arrest for a single offense, *Wing* does not address whether the reasonable person standard applied to a subsequent charge when the accused was already arrested for an original offense.[7]

---

7. Although the *Wing* court's holding is in the context of an individual contemplating police

cooperation, no language appears in the opin-

## B. Would a Reasonable Person in Miller's Position Believe He Was Arrested for OWI on October 15, 2010?

■ The State does not contest that Miller was arrested for interference with official acts on October 15, 2010.[8] The fighting point is whether he was also arrested for OWI.

The district court offered two alternative grounds for dismissing. First, the court stated: "Arguably it matters not, for speedy indictment purposes, if a person is arrested for one crime and later charged with a different crime arising out of the same incident." Second, the court ventured: "Even if such a distinction is to be drawn, in this case the question would still remain whether a reasonable person in the defendant's position would have believed he was under arrest for operating while intoxicated."

We turn to the court's first rationale: that an arrest for one crime is an arrest for all crimes arising from the same incident. We do not find any support in *Wing* for this departure from the holdings in *Edwards* and *Dennison*. The *Wing* decision cites to *Dennison* for general propositions, and does not question its ultimate conclusion: that a defendant may be arrested for one charge stemming from a traffic stop, but that arrest does not necessarily trigger the speedy-indictment clock for all offenses being investigated at that time. Because *Wing* involved only one crime, possession of marijuana with intent to deliver, we do not read its holding to eliminate the offense-specific nature of the speedy indictment rule.

We next address the district court's second basis for dismissal. The court drafted an issue statement in the context of the *Wing* reasonable person standard:

> The question to be answered then is this (with apologies for the run-on sentence): Would a person who was involved in a hit-and-run automobile accident, stopped by a police officer who made inquiries about his drinking and drug usage, then taken to the ground and handcuffed, told he was being taken in for investigation of possible operating while intoxicated, who was transported to the hospital in handcuffs by a second officer, then read an implied consent advisory, was handcuffed to a hospital bed and held down by at least two law enforcement officers, was catheterized and had blood and urine withdrawn for the express purpose of testing the specimens for drug and alcohol content, and who was later the same evening involuntarily committed, transported by police officers and detained at a hospital as a person incapacitated by drugs or alcohol, reasonably believe he was under arrest for operating while intoxicated?

The district court concluded: "The answer is obviously yes."

We appreciate the court's ambition to distill the involved and somewhat bizarre facts of Miller's detention into a single sentence applying the reasonable-person standard. But the nature of the test requires consideration of the *totality* of the circumstances of Miller's interaction with police. *Delockroy*, 559 N.W.2d at 43. Under this review, we must take into account Miller's actions, as well as the officers' responses.

ion limiting the "reasonable person" standard to that scenario alone.

8. In resisting Miller's motion to dismiss, the county attorney argued: "it's the State's position that defendant was arrested for interference with official acts, and, therefore, there wouldn't be any issue with the speedy trial timeline ... because ... [the citation the officer] was filling out was for interference with official acts, not for OWI."

Hearing exhibits offering an audio and video record from dashboard cameras in the squad cars driven by both Trooper Tjepkes and Deputy Lennie aid in our review. The footage provides us with the luxury of perceiving Miller's interaction with law enforcement rather than relying entirely on second-hand accounts. While our review here is not de novo, *Wing*, 791 N.W.2d at 246, the recordings are useful in assessing whether the district court correctly applied *Wing*'s reasonable person standard.

Trooper Tjepkes stopped Miller's car on Interstate 35, requested his identification, and asked if he was aware that he had been in an accident. Miller responded, "No." Miller had trouble finding his driver's license. The trooper asked three times how much Miller had to drink, before requesting Miller slide to the passenger side of the car to avoid the steady stream of interstate traffic by the driver's door. Miller initially refused to move over, and after two minutes of the trooper's coaxing, agreed to sit on the passenger side. Miller then tried to retrieve a cigarette, despite Trooper Tjepkes's insistence that he not smoke. As Trooper Tjepkes reached into the car to take the cigarettes away, Miller grabbed and struck the officer's arm, stating: "No, I mean, I'm drunk."

The trooper yanked Miller from the vehicle, forced him to the ground, and handcuffed him. Once he secured Miller on the ground, Trooper Tjepkes instructed him to "stop resisting—I told you not to open the cigarettes." While being walked back to the squad car, Miller told Trooper Tjepkes, "Well, I mean, I didn't do anything." The trooper responded, "Yeah I told you what to do. I told you not to open up your cigarettes and you kept on resisting me."

At this point in the encounter, a reasonable person would have believed he was under arrest for resisting the officer's commands,[9] not necessarily for OWI. The trooper's assertions of authority immediately followed Miller's recalcitrant actions. Moreover, while Trooper Tjepkes did not make an "explicit statement" indicating Miller was under arrest for interference, he did reference Miller's act of "resisting" him—both moments before and again moments after he placed Miller in handcuffs. *See Wing*, 791 N.W.2d at 249 (considering whether officer manifested a purpose to arrest in the absence of explicit statement); *see also id.* at 252 (finding it significant to the arrest analysis that the officer handcuffed Wing immediately after the officer acknowledged Wing's admission to owning the marijuana in the car).

Soon after the trooper pulled Miller up from the ground, Deputy Lennie arrived at the scene, and the two officers conferred about the events while a still handcuffed Miller stood nearby. Trooper Tjepkes informed the deputy that Miller was "very intoxicated." The two officers talked about Miller's weaving vehicle, his difficulties in finding his license, and the status of the hit-and-run report. They also discussed Miller's lack of cooperation with the trooper's directions. The officers agreed Deputy Lennie would transport Miller, and then they parted ways.

Although the conversation was not directed toward him, Miller's apparent ability to hear the officers' discussion is relevant to the analysis whether a reasonable person in his situation would have believed he was under arrest for OWI. *See id.* at 249. We take into account Trooper Tjepkes's statement to the deputy, within earshot of Miller, that Miller was "very intoxicated." But we also weigh the fact that

---

9. A person commits interference with official -acts by knowingly resisting a peace officer in the performance of an act within the scope of the officer's lawful duty. Iowa Code § 719.1.

neither officer suggested Miller was being arrested for OWI. The bulk of the conversation related to Miller's potential involvement in the hit-and-run collision and his resistance to the trooper's commands.

Miller asked Deputy Lennie why the officers were not attending to the blood coming from the abrasion on his nose. Deputy Lennie asked if Miller needed medical treatment, and Miller confirmed he did. The deputy agreed to take Miller to the hospital before the sheriff's office. The deputy also advised Miller of his *Miranda* rights and further explained them when Miller said he did not understand. Deputy Lennie did not expressly inform Miller of any ground for an arrest.

While driving to the hospital, the deputy identified Miller's vehicle to dispatch as the "one involved in the hit-and-run." In response to Miller's request to see the photographs taken of his vehicle, Deputy Lennie informed him he could see them back at the sheriff's office. Miller also asked whether the hospital would be taking samples for a drug test. Deputy Lennie told him "we can do it at the hospital, but we could do it all at the sheriff's office too."

At this point, a reasonable person in Miller's position would be aware of the deputy's intent to investigate a possible OWI. But an officer may investigate that offense without placing the person under arrest. *See Dennison,* 571 N.W.2d at 495 (holding detention for field sobriety tests and implied consent procedures was not equivalent of arrest). The deputy's answer to Miller's question about chemical testing would signal to a reasonable person that the OWI investigation was ongoing, and he was not yet under arrest for that offense. In this case, law enforcement never had an opportunity to take Miller to the station for further investigation.

We also find the deputy's reason for transporting Miller to the hospital can be distinguished from the purpose found by our supreme court in *State v. Davis,* 525 N.W.2d at 838. In *Davis,* the officers took the arrestee to the hospital to have a blood specimen drawn pursuant to implied consent procedures. *Id.* In the instant case, Miller elected to go to the hospital for medical treatment, not investigatory purposes.

Once at the medical center, Miller's verbal and physical resistance led to the use of restraints.[10] He refused treatment, despite Deputy Lennie and the hospital staff explaining that the procedures were for medical, not investigative purposes. After Deputy Lennie's failed attempts to explain the implied consent procedures to Miller, Dr. Rehmann signed a form pursuant to Iowa Code section 321J.7 stating the patient was in a condition rendering him unable to provide consent.[11]

---

10. Dr. Rehmann testified he asked for the continued restraint and deputies' help for the safety of the medical staff and Miller.

11. Deputy Lennie testified that he asked Dr. Rehmann to sign a form stating Miller was incapacitated, but later realized he used the wrong form. The form, entitled "request to physician, technologist, or nurse," read:

> I, Nicholas Lennie, having reasonable cause to believe that Brian David Miller operated a motor vehicle upon a public highway of this state while under the influence of an alcoholic beverage or other substance of abuse, and having arrested the accused for the offense of operating a motor vehicle

while under the influence of an abusive substances, do hereby request that a specimen of the accused's blood or urine be collected for chemical test or tests thereof for the purpose of determining the alcoholic or drug content of the specimen.

On June 29, 2011, Deputy Lennie provided Dr. Rehmann with an alternative form to certify that Miller was incapacitated.

We do not find the reference to an arrest in the original form affects our analysis. *Wing* directs us to disregard an officer's unstated intent to arrest and to look only from the perspective of the defendant. *See Wing,* 791 N.W.2d at 248–49. No evidence suggests Miller saw the form that night. Therefore, it may

The medical staff and deputies imposed restraints upon Miller at the hospital in response to his combative behavior. A reasonable person in his position would not have taken the measures as indicia of an OWI arrest. *See State v. Smith,* 552 N.W.2d 163, 164 (Iowa Ct.App.1996). Likewise, the doctor-driven substance abuse committal, resulting in officers transporting him to another hospital rather than jail, did not manifest the officers' intent to arrest Miller for OWI.

We agree with the district court's observation that it is difficult to ascertain a reasonable person's perspective when that person is acting unreasonably. But what would be clear to a reasonable person in Miller's situation was that on October 15, 2010, Trooper Tjepkes issued him a citation for interference with official acts, but no citation or complaint for OWI. *See* Iowa Code § 805.1(4) (deeming a citation to be an arrest for purposes of speedy indictment); *see also Dennison,* 571 N.W.2d at 497 (finding it "significant that the officers did not issue a citation or complaint charging Dennison with OWI" on the date of the arrest).

While the officers were doubtless investigating an OWI, and may have had probable cause to arrest Miller for OWI based on their observations of his erratic driving and his physical condition, our existing speedy-indictment precedents do not require law enforcement to make an arrest based on every crime for which they possess probable cause. *See Edwards,* 571 N.W.2d at 500 ("Although police may have had probable cause to arrest Edwards [for the drug crime] at the time, he was only arrested for jaywalking and the related offense involving the flight and resis-

not be considered for purposes of the reason-

tance."). We do not believe that the analysis in *Wing* changes that principle.

The speedy indictment rule is not intended to rush the State into filing charges when "the most crucial evidence is not available." *Dennison,* 571 N.W.2d at 497. In this case, the officers had strong clues Miller had been consuming alcohol, but they also had his admission to using marijuana and to possessing prescription drugs. In addition, the emergency room doctor was concerned Miller's car crash may have caused head trauma or other internal injuries resulting in his irrational behavior. Given these circumstances, it was "beneficial for both the State and the defendant for the officer to refrain from making an arrest" on the indictable offense until the toxicology results were available. *Id.*

We conclude the district court erred in its application of *Wing*'s reasonable-person test to these facts. A reasonable person in Miller's situation would have recognized that he was arrested for interference and not OWI. The trooper restrained him immediately after Miller deflected the trooper's attempt to prevent him from destroying evidence. After that, Miller requested and received medical treatment, never arriving at the original destination of the sheriff's office. We find the most determinative factor was Miller's receipt of a citation for one offense and not the other.

When considering the totality of the circumstances, a reasonable person in Miller's position would not have believed an arrest for OWI occurred on October 15, 2010. The date of arrest for speedy indictment purposes is April 13, 2011. The State filed its trial information within the forty-five-day period as required by the speedy indictment rule. Accordingly, we

able person test.

reverse the dismissal order and remand for further proceedings.

**REVERSED AND REMANDED.**