# IN THE COURT OF APPEALS OF IOWA

No. 14-1930
Filed April 27, 2016

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**JOSHUA BRUCE MATHES,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.


A defendant appeals his convictions for sexual abuse in the second degree and willful injury. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, Stephan J. Japuntich, Assistant Appellate Defender, and Nicholas Behlke, Student Legal Intern, for appellant.

Thomas J. Miller, Attorney General, and Aaron Rogers, Assistant Attorney General, for appellee.


Heard by Potterfield, P.J., and Mullins and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

Joshua Bruce Mathes appeals his convictions for sexual abuse in the second degree and willful injury. He makes four arguments. First, he argues the district court erred when it denied his motion to dismiss on the ground the State violated his right to a speedy indictment. Second, he argues the district court erred when it denied his motions for judgment of acquittal. Third, he argues the district court erred when it denied admission of medical records at trial that contained evidence of prior inconsistent statements attributable to the complaining witness. Finally, he argues that if any of his first three arguments were not preserved, then we should find his counsel was ineffective. We find the district court correctly denied Mathes's motion to dismiss because no arrest occurred on October 1, 2013, to trigger the speedy-indictment rule. We also find the evidence presented at trial was sufficient to withstand Mathes's motions for judgment of acquittal and the district court did not abuse its discretion when it denied admission of the medical records into evidence. Finally, we find the record is not adequate to decide Mathes's ineffective-assistance-of-counsel claim. We affirm.

## I. Background Facts and Proceedings

At approximately 2:45 a.m. on October 1, 2013, Des Moines police officer Greg Trimble was flagged down by a naked woman, later identified as M.C. As Officer Trimble approached her, he "could see that it looked like she'd been assaulted." Trimble called for backup. One of the responding officers, Officer Natalie Licht, arrived to find Officer Trimble talking with M.C. M.C. was lying naked on the ground on the corner of the street crying. Officer Licht noticed M.C.

was physically injured—her hair was askew, she was covered in dirt, she had visible injuries and blood on her face, and she had scrapes on her upper legs. M.C. did not provide detailed information to the officers on scene. She stated only that she had been sexually assaulted at a nearby homeless camp. The officers called an ambulance for M.C.

Officer Licht accompanied M.C. to a nearby hospital in order to find out what had happened to her in greater detail. However, M.C. did not want to answer Officer Licht's questions and refused a sexual assault kit that would have collected and preserved evidence. At one point, still without clothes, M.C. pulled the IV out of her arm and attempted to leave the facility. She was convinced to stay by Officer Licht, who promised both to buy her a pack of cigarettes and a lighter and to drive her to the bus station where she had a ticket to leave town later that morning. Officer Licht believed M.C. was not "in a normal state of mind" and noted later in her report that M.C. admitted she was high on methamphetamine at the time.

Officer Licht was eventually able to build a rapport with M.C. and get the information she needed. M.C. explained she had gone to a homeless shack in Des Moines, where she smoked methamphetamine with two males. Approximately twenty minutes after they had finished smoking, M.C. was ordered to perform fellatio on both men. Both men then had vaginal intercourse with her. According to Officer Licht, M.C. said that after the men had ejaculated one of the men told her, "You called the cops on our dad," and began to punch her repeatedly in the face. M.C. also described the location of the homeless camp and the clothing she had been wearing.

Officer Licht relayed the information she gathered to Officer Trimble by phone. Officer Trimble had remained at the scene with two other officers who had responded to his call for backup, Officers Cerne and Houlton. They found a homeless camp occupied by four males and searched for M.C.'s discarded clothing in an attempt to verify they had found the correct location. All three officers were dressed in full police uniform when they found the camp and interacted with the individuals there. Based upon M.C.'s descriptions of her assailants, Officer Trimble asked two of the men at the homeless camp to provide their names and birth dates. He did so in order to run their information through a police database called I/LEADS, so that he could obtain a photograph for each man to send to Officer Licht for identification. The two men identified themselves as Joshua Mathes and Travis King. Officer Trimble successfully located photographs of each man and transmitted them to Officer Licht. Officer Licht responded that she had shown the photos to M.C., and M.C. identified the men as the two who had assaulted her earlier that morning.

According to Officer Trimble, he then asked Mathes and King if they would be willing to speak with a detective. Initially, only one of the two men was willing to do so, but they both eventually gave consent. Officer Trimble debriefed the on-call detective, Larry Penland, on the status of the investigation thus far and told Penland he had the two subjects—Mathes and King—with him. Detective Penland responded, "We have enough to hold them," which Officer Trimble took to mean they had probable cause to detain the two men. At Detective Penland's direction, Trimble had Mathes and King escorted to a waiting squad car to be transported to the police station to give statements based upon their consent.

Mathes and King were probably patted down and handcuffed per standard procedure and then placed in the back seat.[1] Once in the back seat of the squad car, the men were unable to open the door and exit.

Officer Trimble was clear that at no point in time did he tell either Mathes or King that he was under arrest and in fact never used the word "arrest" when speaking with them. In many respects, the officers treated Mathes and King no differently than the other two men at the homeless camp. All four were patted down for safety reasons immediately when the officers first made contact with them, all four were detained temporarily while the officers investigated at the scene, and all four were photographed on scene by a member of what is now called the crime scene investigations unit. The photographer arrived on scene and took the pictures at approximately 4:25 a.m. Mathes, King, and the other two men are pictured standing and are not handcuffed.

After speaking with Officer Trimble, Detective Penland went to the hospital to interview M.C. Again, she was not cooperative. M.C. only answered a couple of Detective Penland's questions and told him she did not want to press charges against the two men. Detective Penland told her she could change her mind later if she wished to do so. Just in case she did change her mind, Officer Licht took photographs of M.C. and her injuries on a digital camera as evidence.

---

[1] Officer Trimble did not recall whether or not Mathes and King were patted down and handcuffed. However, both he and Detective Penland testified that for safety reasons, passengers are generally not allowed to ride unrestrained in the back seat of squad cars, nor do they allow passengers to ride in the back seat without first being patted down for weapons. Thus, the district court ultimately determined that "it stands to reason" Mathes and King were patted down and "most likely" handcuffed prior to being placed in the squad car for transport.

Detective Penland then went to the Des Moines Police Department's downtown station to interview Mathes and King. He was not yet one-hundred-percent convinced of the identifications made by M.C. because she was "obviously drinking or using drugs or both." When he arrived at the police station, Detective Penland went to the third floor, where Mathes and King were waiting.

Two uniformed officers were in the waiting area standing with Mathes and King. The third floor is not accessible to members of the public even during normal operating hours, but anyone on the floor is able to leave freely through a stairwell. Detective Penland brought Mathes and King separately into an interview room—Mathes first and King second—to obtain their statements. He spoke with each man for ten minutes or less. Detective Penland recalls reading Mathes and King their *Miranda* rights and telling the men that they were not under arrest.

Mathes and King both gave statements denying any involvement in the alleged sexual assault. Their stories were consistent. Mathes described being at the homeless camp when a drunk woman approached with a large alcoholic beverage and said she was looking for someone named "Lucky." Mathes explained they told the woman there was no one present by that name and refused to let her into their shack. He maintained they refused to admit her for forty-five minutes, during which time she insisted they let her in and eventually began calling them names. Mathes said the woman was not injured when she arrived at the shack and also said he did not have any sexual contact with her whatsoever. Detective Penland asked Mathes if he would cooperate and provide a buccal swab for DNA comparison purposes, and Mathes agreed.

After Detective Penland's ten-minute conversations with Mathes and King ended, they were allowed to leave the police station. In his report, Detective Penland wrote, "This case will be carried as suspended as the victim has refused to cooperate completely. We have not identified the suspects, it's unsure even what happened. She obviously has been beaten up but there's no proof that she was sexually assaulted so at this point this case is suspended."

The next day, on October 2, 2013, Detective Penland received a phone call from a lieutenant with the Oskaloosa Police Department, who had new information about the case. He told Detective Penland that when M.C. had arrived in Oskaloosa, she decided to go to the hospital and have a sexual assault kit done. The completed kit was currently in the possession of the Oskaloosa police, and they agreed to bring it to Des Moines. Two days later, on October 4, 2013, M.C. contacted Detective Penland and told him she had changed her mind and wanted to prosecute Mathes and King. Detective Penland told M.C. he would have the sexual assault kit sent to the lab for DNA analysis, which normally takes eight to twelve weeks.

On October 31, 2013, the Des Moines police submitted the sexual assault kit to the State's crime lab. Semen and spermatozoa were identified on swabs taken from M.C.'s navel, vagina, and anus. Male DNA profiles were developed from each swab, which revealed that the semen and spermatozoa were from two sources. The DNA profiles from the vaginal and anal samples were consistent with each other, but the DNA profile from the navel sample was not. Those two male DNA profiles were entered into a database and one returned a possible association with Mathes.

Detective Penland received those preliminary lab results from the crime lab on January 13, 2014. Based upon that information, he filed a preliminary criminal complaint against Mathes on January 28, 2014, and he assisted in Mathes's arrest on January 31, 2014. There is no question Mathes was arrested on January 31, 2014—he was immediately handcuffed by arresting officers and told he was being arrested. The same day Mathes was arrested, Detective Penland conducted a second interview with him and also obtained the buccal swab Mathes had previously agreed to provide for purposes of DNA comparison.

Mathes's buccal swab was submitted on February 3, 2014, for an official comparison. His DNA profile matched that of the semen and spermatozoa found on M.C.'s vaginal and anal swabs. The probability of finding that profile in a population of unrelated individuals chosen at random would be less than one out of one hundred billion.[2]

As he did at the first interview on October 1, 2013, Detective Penland gave Mathes *Miranda* warnings prior to obtaining a statement on January 31, 2014. The second interview was longer than the first and lasted about twenty minutes. Mathes changed his story significantly. Now, he admitted he and the other men had eventually allowed M.C. into the shack and she had been left alone there with just him and King. Mathes stated M.C. smoked methamphetamine while in the shack. Most importantly, Mathes admitted having sexual intercourse with M.C. in the shack.

---

[2] In fact, the actual probability may have been much lower, but the State of Iowa DCI laboratory policy places an artificial cap on the statistic at one out of one hundred billion.

Mathes claimed the sex was not forced and M.C. had egged him on by repeatedly saying "fuck me, fuck me, fuck me" to him. When asked about M.C.'s drunkenness affecting her ability to consent, Mathes said, "[S]he did not give consent but did not say no." Mathes stated after he had sex with M.C., he left and King had sex with her. Mathes could hear and see them through cracks in the shack's wall and door as he smoked a cigarette outside. According to Mathes, both men had vaginal intercourse with M.C. Afterwards, as M.C. was walking away, the beating started. Mathes admitted hitting M.C. with an open hand at least twice. But he denied choking her and blamed King for the bulk of the beating, including specific accusations King had thrown bricks at M.C., stomped on her vagina, and threatened to kill her if she told anyone about what they had done. Mathes told Detective Penland he turned away from these actions, put his head down, and covered his ears. Mathes also blamed King for his prior false statement, saying King had put him up to it and convinced him to lie so they would have consistent stories. Mathes said they discussed what to say to police while they were sitting next to each other at the scene.

The State filed a trial information on March 12, 2014, charging Mathes with one count of sexual abuse in the second degree, in violation of Iowa Code section 709.3(2) (2013), and one count of willful injury, in violation of Iowa Code section 708.4(2). Mathes filed a motion to dismiss on April 9, 2014, on the grounds he was arrested on October 1, 2013, but not formally charged until more than five months later, on March 12, 2014. Mathes argued the State had violated his right to a speedy indictment as set forth in Iowa Rule of Criminal Procedure 2.33(2)(a), which provides: "When an adult is arrested for the

commission of a public offense . . . and an indictment is not found against the defendant within 45 days, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown or the defendant waives the defendant's right thereto." The State resisted the motion, and the trial court held a motion hearing on May 2, 2014. Both Officer Trimble and Detective Penland testified. On May 7, 2014, the district court issued a written ruling denying Mathes's motion to dismiss, holding no violation had occurred because Mathes had not been arrested on October 1, 2013.

Mathes's case proceeded to trial on September 29, 2014. The jury heard the testimony of Detective Penland and other police witnesses—but not Officer Trimble. M.C. and Mathes both testified, so the jury also heard the firsthand accounts of each.

M.C. testified at trial that she had been released from a psychiatric hospital on September 30, 2013. Upon her release, she was planning to hang out with her friend "Lucky" until the next morning, when she would take a bus to her grandmother's home in southeastern Iowa. First though, M.C. went to a bar and got drunk. Then she headed to a wooded area where she believed "Lucky" was staying in a homeless camp. Before she found his camp, she came across a shack with three men inside, and she stopped to chat because she knew one of the three men from a homeless shelter. Then her acquaintance left, and she was left alone with Mathes and King, who she did not know. M.C. admitted taking a hit off of an unknown substance in a glass pipe, but she denied knowing for sure that it was methamphetamine.

M.C. testified Mathes and King ordered her to get up on a table in the shack and strip naked. Then she was raped by Mathes and King simultaneously. M.C. testified Mathes penetrated her vaginally while King penetrated her orally. Mathes ejaculated inside her vagina and stepped away, and then King pulled his penis out of her mouth, walked around, and ejaculated on her stomach. Afterwards, the two men had her get dressed and walked with her away from the shack, with one walking on either side of her. She asked where they were going, and they told her they were going to find "Lucky." Then, without warning, Mathes punched her in the eye.

According to M.C.'s trial testimony, the punch caused her to fall to the ground, at which point Mathes stripped her clothes off and began to strangle her. She recalls King telling Mathes to stop. Mathes told M.C. he would give her "three seconds to stand up and run away," but when she tried to do so, she repeatedly fell down because she was trying to run through wooded brush without any shoes. Each time she fell, Mathes kicked her. Then Mathes found a two-foot-long steel pipe, picked it up, and threatened to insert it in her anus. King told Mathes not to do it, so Mathes instead kicked her some more. Eventually, when M.C. reached the edge of the woods, Mathes let her run away but not before warning her, "If you go to the cops, I'll kill you." M.C. ran through the streets trying to wave down cars, and the second car she came across was Officer Trimble's.

M.C. explained that when she got off her bus in Oskaloosa and went to retrieve her clothes from a domestic violence shelter there, she was convinced by a shelter employee to go to a hospital for a sexual assault kit. When asked

about inconsistencies between her trial testimony and her original statements to Officer Licht, M.C. explained she had no memory of speaking with Officer Licht on October 1, 2013.

Mathes's trial testimony was substantially similar to his second statement to Detective Penland. He testified that on October 1, 2013, he had been with King and two other individuals in the shack when he heard someone say hello. That someone was M.C., who Mathes had seen before, and she was drunk and wanted to come inside. M.C. said she was looking for someone named "Lucky." One of the other men, who Mathes knew by the alias, "Dad," wanted M.C. to leave. Mathes and King ended up in the shack alone with M.C., and M.C. smoked methamphetamine from a pipe. Mathes admitted he smoked methamphetamine that day as well. Mathes testified M.C. then began saying "fuck me, fuck me," not to anyone specifically but rather to both him and King generally. According to Mathes, M.C. took off her clothes of her own volition and then said, "Come on, give it to me."

Mathes testified he had vaginal intercourse with M.C. in the shack. He admitted ejaculating inside of her. When he was done, he got up and told King, "If you want to go ahead and have at it, go ahead. I'm getting out. I'm done." Mathes then left the shack, and King had intercourse with M.C. Mathes denied threatening or forcing M.C. to have intercourse with him, denied ordering her to get up on the table and strip, denied M.C. was unconscious or told him to stop at any point, and denied M.C. performed fellatio on him.

According to Mathes's trial testimony, he and King beat M.C. later, as they were walking with her down a trail towards other homeless camps in search of

"Lucky." Mathes testified M.C. became angry he had taken away her alcoholic beverage earlier and repeatedly called him a racial slur. He reacted by hitting her twice. Then he turned away and covered his eyes as King beat her. After ten or fifteen minutes, Mathes convinced King to stop, and they went back to the shack. Mathes denied having knowledge of how M.C. ended up naked and denied telling her to lay there and die.

Mathes also testified about his interaction with the police. He claimed he, King, and the other two men were handcuffed and sat down on railroad tracks near the shack so the officers could watch over them. He also claimed he did not go to the police station willingly on October 1, 2013, to speak with Detective Penland.[3] Otherwise, Mathes's testimony was consistent with the officers' accounts.

The district court denied Mathes's two motions for judgment of acquittal, the first at the end of the State's case in chief, and the second after the defense rested. On October 3, 2014, the jury returned verdicts of guilty for both charges against Mathes.

Mathes now appeals.

## II. Standard of Review

We review a district court's ruling regarding a motion to dismiss for a violation of a defendant's right to speedy indictment for correction of errors at law. *State v. Wing*, 791 N.W.2d 243, 246 (Iowa 2010). In so doing, "[w]e are

---

[3] This testimony had not been presented to the district court at the hearing on Mathes's motion to dismiss. The court's ruling on that motion was based only upon the testimony of Officer Trimble and Detective Penland.

bound by the findings of fact of the district court if they are supported by substantial evidence." *Id.* (citation omitted).

A motion for judgment of acquittal challenges the sufficiency of the evidence, and we review sufficiency-of-the-evidence rulings for correction of errors at law. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). In determining whether the district court should have granted the motion, it is not our job to resolve conflicts in the record, to assess witness credibility, or to weigh the evidence, as those responsibilities rest with the jurors. *State v. Hutchison*, 721 N.W.2d 776, 780 (Iowa 2006). We must only decide whether the evidence could convince a rational jury that the defendant was guilty beyond a reasonable doubt. *Id.* We will find evidence sufficient to withstand a motion for judgment of acquittal when, "viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in the State's favor," the record contains substantial evidence to support the challenged findings. *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005).

We review a district court's rulings on the admissibility of evidence for an abuse of discretion. *State v. Jordan*, 663 N.W.2d 877, 879 (Iowa 2003).

We may decide ineffective-assistance-of-counsel claims on direct appeal if we determine that the record is adequate. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). We review claims of ineffective assistance of counsel de novo. *Id.* This is our standard because such claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

### III. Analysis

#### A. The District Court's Denial of Mathes's Motion to Dismiss

Mathes first argues the State violated his right to a speedy indictment and the district court therefore erred when it denied his motion to dismiss on that ground. Mathes contends for purposes of applying the rule, he was arrested on October 1, 2013. The State argues he was not arrested until January 31, 2014.

The speedy-indictment rule implements federal and state constitutional guarantees, and its purpose is to "relieve an accused of the anxiety associated with a suspended prosecution and provide reasonably prompt administration of justice." *Wing*, 791 N.W.2d at 246 (citation omitted). An arrest "is the taking of a person into custody when and in the manner authorized by law, including restraint of the person or the person's submission to authority." Iowa Code § 804.5. Iowa Code section 804.14 provides guidance on the proper manner of making an arrest:

> The person making the arrest must inform the person to be arrested of the intention to arrest the person, the reason for arrest, and that the person making the arrest is a peace officer, if such be the case, and require the person being arrested to submit to the person's custody, except when the person to be arrested is actually engaged in the commission of or attempt to commit an offense, or escapes, so that there is not time or opportunity to do so . . . .

However, a seizure by police officers need not technically satisfy the language of sections 804.5 and 804.14 in order to constitute an arrest. *Wing*, 791 N.W.2d at 247–48. Instead, we "must determine on a case-by-case basis whether a seizure constitutes an arrest, considering whether the suspect [is] informed of [his] arrest, [is] handcuffed or booked, submit[s] to authority, or believe[s he is] free to leave." *State v. Miller*, 818 N.W.2d 267, 272 (Iowa Ct.

App. 2012) (citing *Wing*, 791 N.W.2d at 248). In *Wing*, our supreme court set forth the following formulation of the case-by-case analysis to be applied in determining whether an arrest has occurred for purposes of triggering the speedy-indictment rule:

> When an arresting officer does not follow the protocol for arrest outlined in section 804.14 *and does not provide any explicit statements indicating that he or she is or is not attempting to effect an arrest*, we think the soundest approach is to determine whether a reasonable person in the defendant's position would have believed an arrest occurred, including whether the arresting officer manifested a purpose to arrest.

791 N.W.2d at 249 (emphasis added).

Because the speedy-indictment clock begins to run at the time of arrest, the crucial issue before us is whether Mathes was arrested on October 1, 2013, when he was transported, most likely handcuffed, in the back seat of a police car to be interviewed by a detective at a police station. Upon consideration of all of the relevant factors, we agree with the district court Mathes was not arrested on October 1. In reaching this conclusion, we leave undisturbed the district court's findings of fact—primarily based upon a finding Officer Trimble and Detective Penland were credible—because they are supported by substantial evidence.

First, we agree with the district court's conclusion we need not even engage in the case-by-case analysis described in *Wing* because Detective Penland told Mathes he was not under arrest on October 1, 2013, prior to reading Mathes his *Miranda* rights and obtaining a statement. The language of *Wing* dictates we need not determine whether a reasonable person in the defendant's position would believe an arrest occurred unless the officers involved both did not follow the arrest protocol and also did not provide any explicit

statements indicating they were not attempting to effect an arrest. Here, officers did not follow the protocol for arrest outlined in Iowa Code section 804.14, but Detective Penland did make an explicit statement to Mathes that he was not under arrest.

But even if we were to assume Detective Penland's explicit statement was not timely to put Mathes on notice that he was not under arrest, we would still agree with the district court's finding that no arrest occurred, based upon comparison of the facts at issue here with those in *Wing* and many other similar cases. *See, e.g.*, *State v. Hanson*, No. 12-2038, 2014 WL 250250, at *1–2 (Iowa Ct. App. Jan. 23, 2014); *Miller*, 818 N.W.2d at 268–71; *State v. Robinson*, No. 11-0963, 2012 WL 1612047, at *1–2 (Iowa Ct. App. May 9, 2012); *State v. Mihoces*, No. 09-1796, 2010 WL 3324954, at *1 (Iowa Ct. App. Aug. 25, 2010); *State v. Delockroy*, 559 N.W.2d 43, 43–44 (Iowa Ct. App. 1996).

Looking first to the events at the homeless camp, we rely on the following facts to support our finding Mathes was not arrested: officers patted down and detained all four men at the homeless camp while they continued to investigate; Mathes and the other men were not immediately handcuffed[4]; and, most importantly, Mathes was placed in the back seat of a squad car and taken to the police station only after he consented to go and give a statement to a detective (again, we do not disturb the district court's findings of fact).

The facts in *Wing* were substantially similar to those present in Mathes's case in some respects but differ in other, crucial ways. Like here, the defendant

---

[4] Photographs show all four standing, without handcuffs. Officer Trimble testified the photographs were taken at around 4:25 a.m.—more than one-and-one-half hours after M.C. first flagged him down.

in *Wing* was cooperative with the officers at his traffic stop, submitted to a pat down search, and complied with a request to wait nearby while officers investigated further by searching his vehicle. 791 N.W.2d at 244. However, when the defendant in *Wing* admitted to ownership of the marijuana found in his car, he was immediately Mirandized, handcuffed, and placed in the back of a squad car. *Id.* at 245. In contrast, Mathes was placed in a squad car—most likely handcuffed—after he agreed to be transported to the police station to give a statement, not after he admitted to having committed a crime. There is also no evidence Mathes was given *Miranda* warnings on the scene when he was placed in the squad car. These factual distinctions make our case different from *Wing* because they alter the very nature of the police conduct and the way a reasonable person would perceive that police conduct.

Turning to Mathes's interview with Detective Penland, we note the following additional facts, which further support our finding Mathes was not arrested: Penland explicitly told Mathes he was not under arrest; the interview lasted only ten minutes, Mathes was allowed to leave the police station afterward without being booked or processed; Mathes spent no time in a cell or lockup facility within the police station, and Mathes was never told he was not free to leave.

The facts of this case are also distinguishable from those found in three cases recently decided by another panel of this court, which have now been taken for further review by our supreme court. *See State v. Washington*, No. 14-0792, 2015 WL 7567445, at *1–2 (Iowa Ct. App. Nov. 25, 2015); *State v. Williams*, No. 14-0793, 2016 WL 146197, at *1–2 (Iowa Ct. App. Jan. 13, 2016);

*State v. Smith*, No. 14-0812, 2016 WL 146204, at *1 (Iowa Ct. App. Jan. 13, 2016). *Washington*, *Williams*, and *Smith* were companion cases arising from the same set of underlying facts.

In those cases, an underage girl informed police she had been sexually assaulted by three males in the basement of a home. *Washington*, 2015 WL 7567445, at *1; *Williams*, 2016 WL 146197, at *1. Based upon her allegation, a number of officers—including an eight-person tactical team—forced entry into the home later the same morning. *Washington*, 2015 WL 7567445, at *1, *3; *Williams*, 2016 WL 146197, at *1. Some of the officers were armed with assault rifles, and all persons in the residence—including Washington and Smith—were ordered to the floor at gunpoint. *Washington*, 2015 WL 7567445, at *1, *3; *Williams*, 2016 WL 146197, at *1. Williams had been observed leaving the home shortly before the officers' entry and was detained separately elsewhere. *Williams*, 2016 WL 146197, at *1. Washington, Williams, and Smith were handcuffed and placed in police cars. *Washington*, 2015 WL 7567445, at *2–3; *Williams*, 2016 WL 146197, at *1. The defendants' detention and subsequent relocation to the police station was not voluntary. *Washington*, 2015 WL 7567445, at *3. Once at the station, the defendants were placed in interrogation rooms, read their *Miranda* rights, questioned, and not allowed to leave until either they had consented to give buccal and penile swabs or until officers had time to obtain a search warrant for the swabs. *Washington*, 2015 WL 7567445, at *2–3; *Williams*, 2016 WL 146197, at *1–2.

Mathes's case presents different surrounding circumstances than the *Washington*, *Williams*, and *Smith* cases. Most importantly, here the district court

determined—with substantial evidence to support its determination—that Mathes consented to his transport to the police station for questioning on October 1, 2013, and was told by Detective Penland at the station he was not under arrest.

## B. The District Court's Denial of Mathes's Motions for Judgment of Acquittal

Second, Mathes argues the district court should have granted his motions for judgment of acquittal because M.C.'s testimony was "inherently unreliable." More specifically, he points to the facts M.C. was under the influence of alcohol and methamphetamine when the alleged crimes took place, M.C. has a history of mental illness, and there were factual inconsistencies between M.C.'s initial complaints against him and her testimony at trial. Mathes suggests his own testimony was more reliable.

As triers of fact, "[t]he jury is free to believe or disbelieve any testimony as it chooses and should give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). Based upon the evidence presented at trial, a reasonable jury could find M.C. more credible than Mathes and thus determine he had sexually assaulted and beaten M.C. Whatever inconsistencies may exist in M.C.'s testimony and prior statements, the central facts of her allegations against Mathes never changed. M.C. alleged from the very beginning Mathes and King forced her to engage in sexual intercourse with them and she was later beaten by Mathes. Mathes's identity and specific facts about the alleged sexual encounter were corroborated by DNA evidence, and other aspects of her claims were eventually corroborated by Mathes's own admissions. In contrast, the central facts of Mathes's account

changed dramatically—from having no physical contact with M.C. whatsoever to having sexual intercourse with her and then hitting her twice. We find substantial evidence exists to support Mathes's convictions.

### C. The District Court's Denial of Admission of Medical Records into Evidence

Next, Mathes argues the district court erred when it denied admission of medical records at trial that contained evidence of prior inconsistent statements attributable to M.C. According to Mathes, the key component of the documentary evidence is a statement allegedly made by M.C. to medical staff that the sexual encounter with Mathes was consensual in the beginning.[5]

The State objected to admission of the medical records on the bases of hearsay and lack of foundation. The State was allowed to voir dire M.C. regarding the records, and she unambiguously testified she had never seen them before and had no idea what they were. Later, Mathes's counsel made an offer of proof through Detective Penland, who stated his only review of the records was to scan them and make sure they were not blank before placing them in his investigative file. The district court ruled that no witness was put forward who could authenticate or lay foundation for admission of the documents and it would only address the admissibility of the medical records "[w]hen and if that proper foundation [was] laid."

---

[5] Mathes failed to raise his other argument about the documents—that they reveal M.C.'s racial bias against him—before the district court, so we decline to address them. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Mathes has alternatively asked that we consider any issues not adequately preserved for appellate review as part of his ineffective-assistance-of-counsel claim. We discuss that claim below.

However, the district court ruled Mathes could use the records for limited purposes. First, Mathes could use them to refresh M.C.'s recollection and could impeach her during cross-examination by asking her if she recalled making the prior statements they contained. Mathes's counsel was permitted to ask M.C. during cross-examination, "Do you remember telling the medical staff [at the hospital in Oskaloosa] that at first this encounter was consensual?" and "Just to complete the question, you have no recollection of telling anyone at the hospital that your encounter with these two gentlemen was a consensual encounter?" Second, Mathes could question Detective Penland as to whether he had reviewed the records or conducted any follow-up investigation based upon their contents. He was able to establish that Detective Penland had the medical records suggesting the encounter was initially consensual but did not follow up with M.C. about her statement.

M.C.'s and Detective Penland's inability to identify or discuss the medical records falls far short of the requirement of authentication or identification, which is "a condition precedent to admissibility" and "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Iowa R. Evid. 5.901(a). We find the district court did not abuse its discretion when it denied the admission of the medical records into evidence and limited their use by Mathes at trial.

## D. Ineffective Assistance of Counsel

Finally, Mathes makes a broad argument that if any of his first three arguments were not properly preserved for appellate review, then we should find his counsel was ineffective. However, Mathes provides no examples of his

counsel's alleged constitutionally-deficient performance.  He simply recites the applicable legal standard, asks that we proceed on the alternative basis of ineffective assistance of counsel for any issues not adequately preserved because "all issues concern basic legal duties of counsel and the prejudice is the same as claimed above," and states, "The present record is adequate to resolve the claim on direct appeal."  We find the argument and record before us is not sufficient to decide this claim on direct appeal.  *See* Iowa Code § 814.7(3).

## IV. Conclusion

For the reasons stated above, the district court's rulings are affirmed.

**AFFIRMED.**